SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 1 de 14
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 1 of 45
EXHIBIT A

## ESTADO LIBRE ASOCIADO DE PUERTO RICO
## TRIBUNAL DE PRIMERA INSTANCIA
## SALA SUPERIOR DE SAN JUAN

| | |
|---|---|
| **LUIZ A. PENNA,**<br>Demandante,<br><br>v.<br><br>**BACHIR MIHOUBI,**<br>Demandado. | CIVIL NÚM.:<br><br>SALÓN NÚM:<br><br>SOBRE: *INJUNCTION* PRELIMINAR;<br>SENTENCIA DECLARATORIA |

### DEMANDA

**AL HONORABLE TRIBUNAL**:

**COMPARECE** Luiz A. Penna ("Sr. Penna" o "demandante"), por conducto de los abogados que suscriben, y muy respetuosamente expone y solicita:

### I. Breve Introducción y Naturaleza de la Acción

1. Este caso expone una situación profundamente lamentable entre el Sr. Penna y el demandado Bachir Mihoubi ("Sr. Mihoubi"), únicos Miembros de Mr. Pretzels International, LLC ("MPI"), una compañía de responsabilidad limitada.

2. Lo que comenzó hace casi veinte años como una sociedad cimentada en una visión empresarial compartida —tras la invitación que el Sr. Penna, un exitoso empresario y fundador de la marca Mr. Pretzels, extendió en 2006 al Sr. Mihoubi para impulsar la expansión internacional de Mr. Pretzels en mercados donde aún no operaba— ha quedado irreparablemente fracturado. Esta ruptura se debe a la conducta del Sr. Mihoubi, caracterizada por una falta de lealtad, transparencia y respeto hacia los principios fundamentales del deber fiduciario, así como a lo pactado entre las partes.

3. MPI nació en el 2006, como resultado de las representaciones del Sr. Mihoubi—abogado especializado en franquicias—, quien aseguró que, gracias a su conocimiento y experiencia, podía contribuir significativamente al desarrollo internacional de la marca Mr. Pretzels.

4. En virtud de ello, el aquí demandante lo invitó a formar una compañía de responsabilidad limitada con el propósito de expandir dicha marca en aquellos territorios y países donde aún no tenía presencia.

5. Sin embargo, MPI hoy se ha convertido en una estructura vulnerable, expuesta al abuso de poder por parte del Sr. Mihoubi, quien ha actuado de forma unilateral, arbitraria y contraria al contrato de compañía de responsabilidad limitada que ambos suscribieron voluntariamente.

6.      El demandante comparece ante este Honorable Tribunal porque ya no tiene otra alternativa para proteger sus derechos como Miembro Mayoritario de MPI (dueño del 51% del interés propietario o de capital) y como fundador y dueño de la marca Mr. Pretzels, su inversión, y la integridad de la compañía de responsabilidad limitada MPI.

7.      A pesar de que el contrato de compañía de responsabilidad limitada de MPI (en adelante "CCRL de MPI" o "acuerdo operacional de MPI") establece con claridad que cualquier controversia entre los Miembros debe ser canalizada mediante procesos alternos de resolución de conflictos, el Sr. Mihoubi se niega a participar en dichos procesos, persiste en ejercer funciones gerenciales sin autoridad, toda vez que fue despojado de tales funciones conforme al voto del Miembro Mayoritario el pasado 27 de mayo de 2025, y ha tomado decisiones financieras y operacionales que afectan negativamente al demandante y a MPI.

8.      Frente a este escenario, el demandante no solo busca justicia, sino también equilibrio: solicita una medida provisional que prevenga un perjuicio irreparable a la vez que solicita auxilio de este Honorable Foro para hacer valer el CCRL de MPI.

9.      En primer lugar, el demandante solicita respetuosamente a este Honorable Tribunal que emita una orden de injunction preliminar al amparo de la Regla 57 del Reglamento de Procedimiento Civil de 2009 (31 LPRA Ap. V), mediante la cual se ordene al Sr. Mihoubi cesar y desistir de ejercer unilateralmente funciones como Gerente de Operaciones de MPI.

10.     Asimismo, se le requiera abstenerse de tomar decisiones administrativas, financieras o contractuales en nombre de dicha entidad, y se le ordene reconocer de inmediato la voluntad del Miembro Mayoritario de removerlo, conforme al acuerdo operativo de MPI, de todas las funciones gerenciales que ostente[1], en particular la de Gerente de Operaciones.

11.     Esta medida de naturaleza urgente y extraordinaria se solicita mientras el Honorable Tribunal determina si las controversias habidas entre el aquí demandante y el Sr. Mihoubi deben resolverse a través de los mecanismos de mediación y arbitraje previstos en el CCRL de MPI y, de así decidirlo, hasta que concluyan dichos procedimientos alternativos de resolución de disputas.

12.     En segundo lugar, el demandante solicita una sentencia declarativa que: (i) declare que el Sr. Penna, como Miembro con el interés mayoritario (51%) en MPI, actuó de conformidad con el acuerdo operativo al remover al Sr. Mihoubi de sus funciones como Gerente de Operaciones,

---

[1] El Sr. Mihoubi también fue despojado de sus funciones como Secretario y Tesorero de MPI, por lo que también se solicita se le ordene que cesa y desista de ejercer cualquier función relacionada.

Secretario y Tesorero de MPI – determinación que el Sr. Mihoubi rehúsa acatar mientras mantiene secuestrada a la entidad y al aquí compareciente con las manos atadas, a pesar de ser el fundador y dueño de la marca Mr. Pretzels desde hace más de 35 años – y (ii) reconozca y haga valer lo pactado desde el inicio entre las partes: que toda controversia entre los Miembros derivada del CCRL de MPI debe resolverse exclusivamente mediante los mecanismos de mediación y arbitraje establecidos en dicho contrato.

13.     Lo que está en juego aquí no es solo una estructura empresarial, sino el respeto al acuerdo operacional de MPI, la equidad entre miembros, y los principios básicos que sustentan toda relación fiduciaria.

14.     Simple y llanamente, los principios fundamentales del derecho corporativo y de las relaciones contractuales entre las partes —sin mencionar el acuerdo operativo, que constituye el régimen contractual obligatorio para los miembros de una LLC— no permiten que un miembro minoritario decida, a su arbitrio, cuándo acatar las normas que rigen la entidad según su conveniencia. Mucho menos le facultan para secuestrar los destinos y la operación de la LLC.

15.     Frente a esta ineludible realidad, el Sr. Penna acude ante este Honorable Foro en busca de auxilio.

## II.     Las partes

16.     El demandante, Sr. Penna, empresario, casado y residente de Carolina, Puerto Rico, es el fundador y dueño de la marca Mr. Pretzels y posee el 51 % de MPI, ostentando así la Participación Mayoritaria en dicha compañía de responsabilidad limitada.

17.     A su vez, el Sr. Penna es el único accionista de Goodies, Inc., compañía doméstica organizada bajo las leyes del Estado Libre Asociado de Puerto Rico y dueña de las marcas Mr. Pretzels y Oh! My Pretzels.

18.     Su dirección para propósitos de la presente demanda es 1480 Calle San Rafael, San Juan, PR 00909.

19.     El demandado, Sr. Mihoubi, abogado, casado y residente de Atlanta, Georgia, es un miembro de MPI con un interés minoritario de 49%.

20.     Su dirección es 419 Allison Drive, Atlanta GA 30342.

## III.     Jurisdicción y Competencia

21.     Conforme a la Sección 12.27 del CCRL de MPI, el Sr. Penna y el Sr. Mihoubi acordaron someterse irrevocablemente a la jurisdicción y competencia exclusiva de los Tribunales ubicados

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 4 de 14
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 4 of 45
**EXHIBIT A**

en San Juan, Puerto Rico, en caso de ser necesario recurrir a una acción legal para hacer cumplir las disposiciones del referido contrato. (*Véase* **Anejo A**, CCRL de MPI, pág. 27).

22.     Además, conforme a la Regla 3.1 de Procedimiento Civil de 2009 (31 LPRA Ap. V), este Honorable Tribunal posee jurisdicción sobre la presente controversia, conforme al principio jurídico fundamental de que el foro judicial puertorriqueño tiene autoridad para atender todo asunto civil que surja o produzca efectos dentro de su demarcación territorial. En el presente caso, el Sr. Penna, quien ostenta un 51% de participación en MPI y, por ende, es su miembro mayoritario, reside en Puerto Rico hace más de treinta (30) años y ha sido directamente afectado desde esta jurisdicción por las actuaciones arbitrarias, unilaterales y contrarias al acuerdo operativo llevadas a cabo por el Sr. Mihoubi. Fue precisamente desde Puerto Rico que el Sr. Penna ejerció su facultad, conforme al CCRL de MPI, para remover al Sr. Mihoubi de sus cargos como Gerente de Operaciones, Secretario y Tesorero en respuesta a dicha conducta. Los efectos adversos de tales actuaciones —incluyendo la negativa del Sr. Mihoubi de acatar su remoción legítima y a someter la controversia a los mecanismos alternos de resolución de disputas según pactado voluntariamente en el CCRL de MPI— se concretan y continúan manifestándose en Puerto Rico, donde reside el Sr. Penna. Por tanto, este Honorable Tribunal ostenta jurisdicción plena para entender en el presente caso.

23.     La Regla 3.5 de Procedimiento Civil de 2009 (31 LPRA Ap. V) le otorga competencia a este Honorable Tribunal sobre esta acción, por tratarse de controversias que surgen como parte de un acuerdo operacional en el que ambos miembros se obligaron a que en la eventualidad de que fuese necesario presentar una demanda para hacer valer el acuerdo operacional de MPI, el lugar con jurisdicción y competencia sería el Tribunal General de Justicia situado en San Juan, Puerto Rico.[2]

### IV.     Antecedentes relevantes

24.     Mr. Pretzels es una marca pionera en la elaboración de pretzels suaves y aromáticos, horneados en una amplia variedad de sabores.

25.     El Sr. Penna fundó Mr. Pretzels en Puerto Rico en el año 1993 y en el 1994 abrió su primer quiosco en Puerto Rico.

---

[2] *Véase* **Anejo A**, Sección 12.27 (**Venue and Jurisdiction**) del acuerdo operacional de MPI ("*[s]hould a lawsuit be necessary to enforce this Operating Agreement the parties [Luiz A. Penna and Bachir Mihoubi] agree that jurisdiction and venue shall be in San Juan, Puerto Rico*").

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 5 de 14
Case 3:25-cv-01323    Document 1-1    Filed 06/14/25    Page 5 of 45
**EXHIBIT A**

26. Desde ese entonces, la marca ha estado ofreciendo deliciosos pretzels enrollados a mano, recién horneados cada día.

27. Los pretzels, elaborados con trigo, son bajos en grasa y ofrecen una combinación ideal de sabor, frescura y valor nutricional.

28. La masa se prepara al momento y se enrolla a mano frente a los clientes, garantizando una experiencia auténtica y de alta calidad.

29. Gracias a su sabor irresistible, los pretzels de Mr. Pretzels gozan de un atractivo universal.

30. Actualmente, la marca cuenta con 16 pequeñas tiendas o quioscos ("*kiosks*") alrededor de la Isla de Puerto Rico, empleando a aproximadamente 120 empleados en Puerto Rico.

31. Fuera de Puerto Rico, Mr. Pretzels cuenta actualmente con aproximadamente 220 tiendas en Inglaterra, Israel, Brasil, Venezuela, Chile y Canadá.

32. Entre el 1994 y el 2006, el Sr. Penna expandió la marca de Mr. Pretzels a nivel internacional, llevando los quioscos de Mr. Pretzels a Estados Unidos, Brasil, Venezuela, Chile, Inglaterra, Portugal y España.

33. Con excepción de Portugal, España y Estados Unidos, Mr. Pretzels sigue teniendo una presencia sólida y exitosa en todos los países en los que ya estaba presente antes de 2006 y en los que MPI ni el Sr. Mihoubi tienen participación o inherencia alguna.

34. Allá para el 2022-2023, luego de que el Sr. Penna adquiriera en el 2002 los derechos para desarrollar el concepto Cinnabon en Puerto Rico y Brasil, el Sr. Mihoubi—quien en aquel entonces era abogado de Cinnabon—se acercó al Sr. Penna para ofrecerle sus servicios a cambio de una participación en un nuevo negocio.

35. Una de las representaciones clave que hizo el Sr. Mihoubi al Sr. Penna, y que llevó a este último a aceptar la propuesta, fue que no sería necesaria una inversión significativa por parte del Sr. Penna para expandir la marca a nivel mundial, más allá de ceder los derechos sobre sus marcas a una entidad de nueva creación en la que ambos tendrían participación, puesto que los gastos serían asumidos por las otras marcas.

36. Esta afirmación se basaba en la afirmación del Sr. Mihoubi de que "trabajaba con distintas marcas", contaba con amplia experiencia en el campo de las franquicias, e incluso impartía charlas sobre el tema a nivel internacional.

37. Así las cosas, en el año 2006, se creó la entidad MPI con la idea de expandir y acelerar el crecimiento y la presencia internacional de la que ya gozaba Mr. Pretzels, descansando en las

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 6 de 14
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 6 of 45

EXHIBIT A

representaciones del Sr. Mihoubi. Ahora bien, es importante destacar que en reconocimiento de la presencia internacional que ya tenía Mr. Pretzels, el acuerdo operacional de MPI estableció expresamente que MPI no podría operar o franquiciar quioscos de Mr. Pretzels en Puerto Rico ni en ningún otro país en el que Mr. Pretzels ya estuviera presente previo a la creación de MPI.

### a. El CCRL de MPI

38. El Sr. Penna y el Sr. Mihoubi suscribieron el CCRL de MPI con fecha de efectividad de 21 de agosto de 2006. (**Anejo A**, CCRL de MPI).

39. Según consta en la Secciones 3.5 y 6.1 del CCRL de MPI, el 21 de agosto de 2006, el Sr. Mihoubi fue designado Gerente de Operaciones, Secretario y Tesorero. (*Id.*, págs. 4 y 8). Para tal designación, conforme a la Sección 6.1 del CCRL de MPI los miembros votaron basado en sus respectivos porcentajes de interés de capital en MPI. (*Id.*, pág. 8).

40. Como Gerente de Operaciones, el Sr. Mihoubi era responsable de la supervisión general de los negocios y asuntos de MPI. (*Id.*, pág. 8).

41. Según surge de las Secciones 6.1 y 6.6 del CCRL de MPI, el Sr. Mihoubi estaba a cargo del desarrollo internacional de MPI. (*Id.*, págs. 8-9).

42. En particular, la Sección 6.6 del CCRL de MPI, establece que, como Gerente de Operaciones, el Sr. Mihoubi debía dedicar el tiempo y la energía necesarios para administrar los negocios y asuntos de la Compañía. (*Id.*, pág. 9).

43. Sin embargo, su autoridad como Gerente de Operaciones tenía que ejercerse bajo la dirección y supervisión última de los Miembros, y con sujeción a las limitaciones establecidas en el CCRL de MPI. (*Id.*, págs. 8-10).

44. Dentro de esos límites, le correspondía al Sr. Mihoubi actuar en nombre de MPI respecto de sus negocios, propiedades y asuntos. (*Id.*, págs. 9-10).

45. Además, tenía la responsabilidad de implementar el CCRL de MPI, así como las resoluciones y decisiones adoptadas por los Miembros. (*Id.*, pág. 10).

46. También, dentro del presupuesto aprobado por los Miembros, tenía que establecer y ajustar salarios y compensaciones, contratar o despedir personal y regular sus horarios de trabajo. (*Id.*).

47. Asimismo, como Gerente de Operaciones el Sr. Mihoubi tenía el deber de mantener informados a los Miembros sobre los asuntos relevantes relacionados con el desarrollo internacional de MPI, los servicios prestados, la situación financiera, los ingresos y los gastos operativos. (*Id.*).

48.     Para cumplir con ello, debía presentar informes en cada reunión regular de los Miembros, o cuando estos así lo requirieran. (*Id.*).

49.     También le correspondía adoptar las medidas que considerara necesarias o apropiadas para el cumplimiento de sus funciones, y podía delegar responsabilidades o autoridad específica en otros gerentes, miembros, funcionarios, agentes o afiliados, salvo que los Miembros, por mayoría, lo hubieran prohibido. (*Id.*).

50.     Significativamente, conforme a la Sección 6.1.2, el Sr. Mihoubi, como Gerente de Operaciones no tenía la autoridad para contraer deudas o asumir obligaciones de financiamiento sin una resolución debidamente aprobada por los Miembros. (*Id.*, pág. 8).

51.     Conforme a la Sección 6.10 del CCRL de MPI, los Miembros y el Gerente de Operaciones deberán desempeñar sus funciones —ya sea como miembros o, en el caso del Gerente de Operaciones, como administrador— de una manera que razonablemente consideren que responde al mejor interés de MPI, y con el grado de diligencia que emplearía una persona prudente en una posición similar y bajo circunstancias comparables. (*Id.*, pág. 11).

52.     Según lo dispuesto en la Sección 6.10 del CCRL de MPI, el Gerente Operativo era responsable frente a MPI, los Miembros u otras personas, en los casos en que sus actos constituyeran fraude, conducta dolosa, negligencia grave o incumplimiento de sus deberes fiduciarios. (*Id.*).

53.     Conforme a la Sección 6.2 del CCRL de MPI, los gerentes de MPI serán elegidos anualmente por los Miembros durante la reunión anual. (*Id.*, pág. 9).

54.     Asimismo, dicha Sección establece que los gerentes ejercerán sus funciones desde la fecha de su elección hasta la siguiente reunión anual, y permanecerán en el cargo hasta que se elija a su sucesor, salvo que renuncien antes o sean removidos. (*Id.*).

55.     La Sección 6.13 del CCRL de MPI dispone que un Miembro podrá ser removido en cualquier momento, por justa causa, mediante el voto de la mayoría de los Miembros con derecho a voto. (*Id.*, pág. 12).

56.     Según la Sección 4.3 del CCRL de MPI, el Sr. Penna posee el cincuenta y uno por ciento (51 %) de MPI, ostentando así la Participación Mayoritaria, definida en la Sección 3.15 del mismo acuerdo como el interés equivalente al 50 % más el 1 % de las Participaciones de Capital de MPI. (*Id.*, págs. 5-6).

57.     De conformidad con la Sección 8.5 del CCRL de MPI, cualquier acción que se requiera o se permita llevar a cabo en una reunión de los Miembros podrá realizarse sin necesidad de celebrar dicha reunión, siempre que la acción sea aprobada mediante el consentimiento escrito de los Miembros que posean el porcentaje de Participaciones de Capital en circulación necesario para adoptar dicha decisión y que estén facultados para votar al respecto. (*Id.*, págs. 15-16).

58.     Está acción sin reunión deberá constar en uno o más consentimientos escritos, los cuales se archivarán en los registros de MPI. (*Id.*, pág. 16).

59.     De conformidad con la Sección 12.11.1 del CCRL de MPI, toda controversia entre el Sr. Penna el Sr. Mihoubi, ya sea derivada de dicho CCRL o relacionada con este de cualquier forma, que no pueda resolverse directa y de buena fe entre las partes, será sometida a un proceso de mediación, el cual tendrá lugar en San Juan, Puerto Rico. (*Id.*, pág. 24).

60.     Según lo dispuesto en la Sección 12.11.2 del CCRL de MPI, si la controversia no se resuelve mediante la mediación, las partes deberán someter la disputa a arbitraje ante un árbitro neutral con residencia en San Juan, Puerto Rico. (*Id.*).

61.     La Sección 12.29 del CCRL de MPI establece que el CCRL se regirá por las leyes del Estado Libre Asociado de Puerto Rico en todos los asuntos, incluyendo, pero sin limitarse a, cuestiones relacionadas con su validez, interpretación, efectos y cumplimiento. (*Id.*, pág. 27).

62.     Asimismo, conforme a lo dispuesto en la Sección 12.29 del CCRL de MPI, cada Miembro tendrá el derecho de presentar una solicitud ante cualquier tribunal del Estado Libre Asociado de Puerto Rico para que se reconozca una violación del CCRL, se prohíba su incumplimiento o se ordene su cumplimiento.

63.     Además, conforme a lo dispuesto en la Sección 12.27, las partes acordaron que, en caso de ser necesaria una demanda para hacer valer el CCRL de MPI, el tribunal con jurisdicción y competencia sería el ubicado en San Juan, Puerto Rico. (*Id.*).

### b.  Violaciones de los deberes fiduciarios atribuidas al Sr. Mihoubi

64.     Como Gerente de Operaciones, el Sr. Mihoubi tenía el deber fiduciario de actuar en todo momento en el mejor interés de MPI, con lealtad, diligencia y buena fe.

65.     Este deber implicaba que debía manejar los recursos, decisiones y operaciones de MPI de manera transparente, responsable y sin buscar beneficios personales indebidos.

66.     Asimismo, el Sr. Mihoubi debió evitar conflictos de interés y abstenerse de realizar actos que puedan perjudicar a MPI o a los Miembros.

67.    A pesar de ello, el Sr. Mihoubi incurrió en un incumplimiento flagrante de dicho deber.

68.    En semanas recientes el aquí demandante revisó los estados bancarios de MPI desde 2020 hasta febrero de 2025 tras un requerimiento al Sr. Mihoubi.

69.    Del análisis de los registros, el aquí demandante descubrió que el Sr. Mihoubi recibió $619,993.38 en pagos o distribuciones durante dicho período, mientras que el Sr. Penna recibió únicamente $411,103.40, a pesar de contar con una participación del 51 % en la propiedad.

70.    Esta asignación desproporcionada—equivalente a un 60.12 % para el Sr. Mihoubi y solo un 39.78 % para el Sr. Penna—constituye una evidente violación de las obligaciones fiduciarias por parte del Sr. Mihoubi.

71.    Además, al revisar dichos estados bancarios, el aquí demandante descubrió que el Sr. Mihoubi, en violación de sus deberes de fiducia, obligó unilateralmente a MPI a obtener un préstamo del Programa de Protección de Cheques de Pago ("préstamo PPP") bajo la Ley de Ayuda, Alivio y Seguridad Económica ante el Coronavirus ("Ley CARES"), a pesar de que MPI no tenía empleados ni nómina, y sin contar con la resolución de los Miembros requerida conforme a la Sección 6.1.2 del CCRL.

72.    El préstamo fue posteriormente reembolsado con más de $30,000 provenientes de fondos de MPI, sin el consentimiento del Sr. Penna, lo que constituye una violación adicional de los deberes fiduciarios.

73.    El Sr. Penna también descubrió que el Sr. Mihoubi se asignó y/o se autorizó pagos garantizados ("*guaranteed payments*") sin la debida resolución de ambos Miembros y/o sin el consentimiento previo del Sr. Penna, Miembro con la participación mayoritaria en MPI, todo ello en violación al CCRL de MPI.

74.    Desde finales del mes de julio de 2024, el Sr. Penna ha intentado negociar de buena fe con el Sr. Mihoubi la adquisición de su participación del 49% en el capital de MPI.

75.    Estas gestiones se llevaron a cabo conforme a las disposiciones del CCRL de MPI.

76.    El propósito de dichas negociaciones era resolver las desavenencias y disputas surgidas entre el Sr. Penna y el Sr. Mihoubi.

77.    El Sr. Penna actuó con el objetivo de resolver las diferencias entre miembros de buena fe.

78.    Sin embargo, el Sr. Mihoubi adoptó posturas tan intransigentes que impidieron cualquier avance significativo.

79.     Ante esta situación de impasse, el Sr. Penna se vio obligado a escalar el conflicto al mecanismo alternativo de resolución de disputas contemplado en el CCRL de MPI.

80.     Así las cosas, el 27 de mayo de 2025, el Sr. Penna invocó la Sección 12.11.1 del CCRL de MPI y exigió al Sr. Mihoubi iniciar un proceso de mediación para abordar las violaciones a los deberes fiduciarios cometidas por el Sr. Mihoubi, así como otros asuntos.

81.     Sin embargo, el Sr. Mihoubi se negó a participar en dicho proceso.

82.     Ese mismo día, el Sr. Penna, en su calidad de miembro con la Participación Mayoritaria en MPI y a raíz de su descontento general con el desempeño del Sr. Mihoubi como Gerente de Operaciones de MPI que solo se agravó con los hallazgos recientes tras examinar los estados bancarios de MPI para los últimos cinco (5) años, firmó un consentimiento escrito mediante el cual procedió a la remoción, por justa causa, del Sr. Mihoubi como miembro de MPI, así como de sus funciones como Gerente de Operaciones, Secretario y Tesorero de MPI. (*Véase* **Anejo B**, Consentimiento).

83.     Habida cuenta de su remoción como Gerente de Operaciones, Secretario y Tesorero de MPI, en el consentimiento escrito se le requirió al Sr. Mihoubi a que en el término de diez (10) días – a vencer el 6 de junio de 2025 – efectuara la transferencia ordenada al Sr. Penna de todos los récords administrativos, operacionales y financieros de MPI en formato impreso y digital que estuviesen bajo el control o posesión del Sr. Mihoubi y/o cualquier persona afiliada al Sr. Mihoubi. (*Id.*).

84.     Pasado dicho plazo de diez (10) días e inclusive al día de hoy, el Sr. Mihoubi no efectuó tal transferencia ordenada y continúa aferrado a los cargos de Gerente de Operaciones, Secretario y Tesorero de MPI.

85.     Adviértase que para la remoción del Sr. Mihoubi como Gerente de Operaciones, Secretario y Tesorero de MPI no se requiere causa conforme al CCRL de MPI, solo que el Sr. Penna ejerciera su voto correspondiente a su porciento mayoritario (51%) de participación de capital en MPI.

86.     No obstante, el Sr. Mihoubi rechazó dicha decisión y, entre otras cosas, se niega a abandonar sus funciones como Gerente de Operaciones, Secretario y Tesorero de MPI.

87.     El 5 de junio de 2025, el Sr. Penna invocó la Sección 12.11.2 del CCRL de MPI y exigió al Sr. Mihoubi iniciar un proceso de arbitraje para abordar las violaciones a los deberes fiduciarios cometidas por el Sr. Mihoubi, así como otros asuntos relacionados.

88.     El Sr. Mihoubi también se negó a participar en arbitraje.

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 11 de 14
Case 3:25-cv-01323   Document 1-1   Filed 06/14/25   Page 11 of 45
EXHIBIT A

## Primera causa de acción
### (Regla 57.2 de Procedimiento Civil de 2009, Injunction preliminar)

89.    Se reiteran e incorporan las alegaciones en los párrafos anteriores.

90.    La conducta del Sr. Mihoubi, quien ha incurrido en serias violaciones de sus deberes fiduciarios al apropiarse de distribuciones desproporcionadas y endeudar a MPI sin autorización ni propósito legítimo, ha causado un perjuicio sustancial al Sr. Penna.

91.    Pese a ello, el Sr. Mihoubi continúa ejerciendo control sobre la administración de MPI, en abierta contradicción con los principios de gobernanza compartida establecidos en el CCRL y sin contar con el consentimiento ni participación del otro miembro de MPI, el Sr. Penna.

92.    Esta situación ha expuesto al Sr. Penna a un daño concreto y continuo, cuya naturaleza es irreparable.

93.    La continuidad del Sr. Mihoubi en el cargo de Gerente de Operaciones, habiendo demostrado un patrón de conducta abusiva, compromete el funcionamiento y la viabilidad de MPI, afectando adversamente los derechos de membresía y los ingresos del Sr. Penna. En este contexto, no existe un remedio adecuado en ley que pueda reparar efectivamente el daño causado por el uso indebido del control administrativo, razón por la cual resulta imprescindible la intervención inmediata del Honorable Tribunal.

94.    El Sr. Penna tiene una alta probabilidad de prevalecer en el fondo del caso, dado que la evidencia demuestra con claridad que el Sr. Mihoubi distribuyó fondos de manera inapropiada buscando beneficio propio (y en detrimento del Sr. Penna) y contrajo obligaciones financieras a nombre de MPI sin autorización ni resolución formal, en contravención de las disposiciones del CCRL de MPI y a espaldas del Sr. Penna.

95.    Estos actos violan principios fundamentales de lealtad, transparencia y consentimiento mutuo, que son esenciales en cualquier compañía de responsabilidad limitada.

96.    No existe el riesgo de que la controversia se torne académica ya que la continuidad de la administración unilateral por parte del Sr. Mihoubi podría provocar la pérdida de activos, el incumplimiento de obligaciones legales o contractuales, o el deterioro irreversible de las relaciones entre los Miembros.

97.    El remedio solicitado—un injunction preliminar que suspenda la capacidad del Sr. Mihoubi de continuar ejerciendo el puesto de Gerente de Operaciones así como las funciones de Secretario y Tesorero—responde también a un interés público legítimo: preservar la integridad de la administración empresarial, fomentar el cumplimiento de deberes fiduciarios y garantizar que las

controversias entre miembros se canalicen mediante los mecanismos acordados por las partes, incluyendo la mediación y el arbitraje.

98.     El Sr. Penna ha actuado con plena diligencia y buena fe al invocar formalmente las Secciones 12.11.1 y 12.11.2 del CCRL de MPI, solicitando que las partes sometan sus controversias a mediación y arbitraje, conforme a lo pactado de manera expresa y voluntaria por las partes en el acuerdo operacional de MPI.

99.     No obstante, ante la negativa del Sr. Mihoubi a someterse al mecanismo acordado, el Sr. Penna no ha tenido otra alternativa que acudir ante este Honorable Tribunal para solicitar la medida provisional aquí planteada, mientras se resuelve la procedencia del proceso de resolución alternativa de disputas y, de determinarse que procede, hasta la conclusión de este.

<u>**Segunda causa de acción**</u>
**(Regla 59 de Procedimiento Civil de 2009, Sentencia declaratoria)**

100.    Se reiteran e incorporan las alegaciones en los párrafos anteriores.

101.    La parte peticionaria solicita respetuosamente que este Honorable Tribunal emita una sentencia declaratoria en la que se establezca con claridad que toda controversia surgida entre el Sr. Penna y el Sr. Mihoubi, ya sea derivada del CCRL de MPI o relacionada de cualquier forma con este, debe ser sometida obligatoriamente a un proceso de mediación y, de no resolverse mediante dicho proceso, a arbitraje, conforme a lo dispuesto en las Secciones 12.11.1 y 12.11.2 del CCRL de MPI.

102.    Según estipula expresamente la Sección 12.11.1 del CCRL de MPI, cualquier controversia entre los miembros que no pueda resolverse directa y de buena fe entre las partes deberá someterse a mediación y dicho proceso tendrá lugar en San Juan, Puerto Rico.

103.    Esta cláusula constituye un acuerdo vinculante entre los Miembros, y forma parte integral del marco normativo interno de MPI.

104.    Más aún, la Sección 12.11.2 establece que, si la controversia no se resuelve mediante mediación, entonces las partes deberán someter la disputa a arbitraje obligatorio ante un árbitro neutral con residencia en San Juan, Puerto Rico.

105.    Esta disposición refleja el claro consenso contractual entre los Miembros para canalizar sus disputas mediante métodos alternos de resolución de conflictos, en lugar de litigar sus diferencias en los tribunales.

106.    En vista de la negativa del Sr. Mihoubi a participar voluntariamente en el proceso de mediación invocado por el Sr. Penna, y con el propósito de hacer valer lo pactado entre las partes,

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 13 de 14
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 13 of 45

**EXHIBIT A**

la parte peticionaria entiende necesario y procedente que este Honorable Tribunal declare los derechos y obligaciones contractuales establecidos en la Secciones 12.11.1 y 12.11.2 del CCRL de MPI, y ordene al Sr. Mihoubi y al Sr. Penna a someter sus controversias—presentes o futuras—al proceso escalonado de mediación y arbitraje establecido contractualmente.

107.    Una sentencia declaratoria en estos términos respetaría la voluntad de las partes expresada en el CCRL de MPI.

**POR TANTO**, a la luz de los hechos antes expuestos y del derecho aplicable, los demandantes solicitan respetuosamente que este Honorable Tribunal:

a.  Emita un injunction preliminar ordenando que el Sr. Mihoubi cese y desista de ejercer unilateralmente facultades como Gerente de Operaciones, Secretario y Tesorero de MPI y se abstenga de tomar decisiones administrativas, financieras o contractuales en nombre de esta, mientras este Honorable Tribunal determina si la controversia debe proceder a mediación y arbitraje conforme al CCRL de MPI y, de determinarse que procede, hasta la conclusión de este;

b.  Emita una sentencia declaratoria a los efectos de que, conforme a las Secciones 12.11.1 y 12.11.2 del CCRL de MPI, toda controversia entre el Sr. Penna y el Sr. Mihoubi, ya sea derivada de dicho contrato o relacionada de cualquier forma con este, que no pueda resolverse directa y de buena fe entre las partes, deberá ser sometida a un proceso de mediación ante un mediador certificado por el tribunal en San Juan, Puerto Rico; y si dicha mediación no prospera, las partes deberán someter la disputa a arbitraje ante un árbitro neutral con residencia en San Juan, Puerto Rico; y

c.  Se solicita además cualquier otro remedio que en derecho o en equidad proceda.

**RESPETUOSAMENTE SOMETIDA**, en San Juan, Puerto Rico, hoy 13 de junio de 2025.

**CERTIFICAMOS** que en esta fecha sometimos electrónicamente el presente escrito utilizando el SUMAC.

*Abogados del Sr. Luiz A. Penna*



www.CSTLAWPR.com
PO Box 195075
San Juan, PR 00919-5075
Tel.: (787) 523-3434

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 14 de 14
Case 3:25-cv-01323   Document 1-1   Filed 06/14/25   Page 14 of 45

**EXHIBIT A**

Fax: (787) 523-3433
vacevedo@cstlawpr.com
lllach@cstlawpr.com
crivera@cstlawpr.com

*f/VÍCTOR O. ACEVEDO HERNÁNDEZ*
RUA Núm.: 16,641

*f/LUIS F. LLACH ZÚÑIGA*
RUA Núm.: 15,156

*f/CHRISTOPHER T. RIVERA BLAS*
RUA Núm.: 20,840

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 1 de 11
Case 3:25-cv-01323   Document 1-1   Filed 06/14/25   Page 15 of 45
**EXHIBIT A**

## OPERATING AGREEMENT

**THIS OPERATING AGREEMENT** (the *"Agreement"*), is made as of August 21, 2006 (the *"Effective Date"*), by and among **BACHIR MIHOUBI**, an Individual, **LUIZ A. PENNA**, and **MR. PRETZELS INTERNATIONAL, LLC**, a Georgia Limited Liability Company (hereinafter the "Company"), upon the following terms and conditions:

### W I T N E S S E T H

**WHEREAS,** Bachir Mihoubi is a franchise consultant who has been approached by Luiz A. Penna to contribute to the business of the Company, and

**WHEREAS,** Luiz A. Penna is the sole and exclusive owner of all the rights in and to the pretzels mix used to make the dough necessary to produce the pretzels sold in the stores to be owned and operated or franchised by the Company, and

**WHEREAS,** Luiz A. Penna is the sole shareholder of Goodies, Inc., a Puerto Rican corporation that exclusively owns the registered intellectual property rights in the brand name "Mr. Pretzels" and "Oh! My Pretzels", and

**WHEREAS,** Luiz A. Penna representing Goodies, Inc., has the right and agreed to license the brand name of "Mr. Pretzels" and "Oh! My Pretzels" to the Company for the Company's use and operation of Mr. Pretzel stores for the life of the Company, under the condition that the Company will not operate any Mr. Pretzel store in Puerto Rico nor in any other country where Mr. Pretzels is operating on the date hereof, and

**WHEREAS,** Luiz A. Penna has further agreed to license the trademark, and the know-how and will provide the pretzels mix (not the recipe) to the Company to produce the pretzels to be sold in the stores under the condition that the Company will not operate any Mr. Pretzels stores in Puerto Rico nor in any other country where Mr. Pretzels is currently operating, and

**NOW, THEREFORE**, for and in consideration of the mutual promises contained herein, and other good and valuable consideration, the parties agree that the foregoing recitals are incorporated herein by reference and made a part hereof as though set forth at length throughout this Agreement and further agree as follows:

1

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 2 de 11
Case 3:25-cv-01323  Document 1-1  Filed 06/14/25  Page 16 of 45
**EXHIBIT A**

# ARTICLE I
# ORGANIZATION

**1.1**    **Name and Organization.** The business of the Company shall be conducted under the name of Mr. Pretzels International, LLC, a Georgia Limited Liability Company.

**1.2**    **Effective Date and Term.** The Company shall commence existence on the date indicated on its certificate of registration, and will continue perpetually thereafter, unless sooner terminated and dissolved in accordance with the terms of this Operating Agreement.

**1.3**    **Place of Business.** The Company's principal place of business shall be located at 419 Allison Drive, Atlanta, Georgia 30342, or at such other place as the Members may designate.

**1.4**    **Registered Office and Agent.** The registered office of the Company, required by the Act to be maintained in the State of Georgia, may, but need not be identical with the Principal Office in the State of Georgia. The address of the initial registered office of the Company is 419 Allison Drive, Atlanta, Georgia 30342, and the initial registered agent at such address is Bachir Mihoubi. The registered office and the registered agent may be changed from time to time by action of the Members and by filing the prescribed form with the Georgia Secretary of State.

**1.5**    **Purpose.** The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the Act, and to have and exercise all powers conferred by the laws of the State of Georgia upon limited liability companies formed under the Act.

# ARTICLE II
# OWNERSHIP AND PROPRIETARY RIGHTS



**2.1**    **Ownership.**    Goodies, Inc. shall remain the sole and/or exclusive owner of the brand names "Mr. Pretzels" and "Oh! My Pretzels" and by no means the perpetual license granted by Goodies Inc., to the Company to operate or franchise the pretzel stores under the said brands and/or trademarks will be understood or construed as a cession and/or transfers and/or assignment of ownership whatsoever to the Company of the said brands and/or trademarks, as registered in Puerto Rico, or in the USA. The pretzels mix used to produce the pretzels to be sold in the stores owned and operated by the Company and /or by its franchisees if any sold or issued in the future, will remain the sole and exclusive ownership of Goodies, Inc. and by no means the license granted by Goodies, Inc. to the Company to use the pretzels mix will be understood or construed as a cession and/or transfers and/or assignment of such ownership. Notwithstanding anything to the contrary herein, Luiz A. Penna (1) shall cause Goodies, Inc. to grant the Company a perpetual and exclusive license of

2

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 3 de 11
Case 3:25-cv-01323   Document 1-1   Filed 06/14/25   Page 17 of 45
**EXHIBIT A**

all its brands and trademarks, including without limitations, all its brands and trademarks created or designed after the execution hereof, and (2) shall grant to the Company a perpetual and exclusive license of all his brands and trademarks, including without limitations, all his brands and trademarks created or designed after the execution hereof, in the territories where the Company will operate or franchise stores, provided that such brands or trademarks are registered or used by Goodies, Inc. or Luiz A. Penna, as the case will be, in such territory(ies).

**2.2     Transfer of rights.**    Luiz A. Penna representing Goodies Inc. agrees that in case Goodies, Inc. transfers any of its right or interests to anyone else, the transfer of said interest and/or shares shall contain a clause conditioning the sale and/or transfer of said interest and/or shares to this Agreement, in the sense that said sale and/or transfer shall specifically state that the buyer or transferee will be obliged to allow the Company to continue to use the brand name "Mr. Pretzels" and "Oh! My Pretzels" during the whole life or duration of the Company.  With regard to the pretzels mix used to make the dough necessary to produce the pretzels sold in the stores owned and operated by the Company and/or by the franchises, if any, sold and/or issued in the future, Luiz A. Penna, in his name as well as in the name and on behalf of Goodies, Inc. agrees and obliged himself and his heirs to continue to allow the Company and/or the franchisees to use said pretzels mix, brands and trademarks for the duration of the life of the Company.

**ARTICLE III**
**DEFINITIONS**

**3.     Definitions.**   In addition to the terms defined elsewhere in the text of this Operating Agreement, the following definitions apply to this Operating Agreement:

**3.1     "Act"** shall mean the "Georgia Limited Liability Company Act", as it may be amended or superseded from time to time.

**3.2     "Bona Fide Offer"** shall mean a third party's written offer to purchase some or all of the Membership interest held by a Member which, if accepted, would obligate the third party to purchase the Membership interest offered, and which sets forth the equity interest in the Company to be purchased, the dollar value of consideration offered per the equity interest, and a payment schedule.

**3.3     "Code"** shall mean the Internal Revenue Code of 1986, as amended from time to time, or any successor statute thereto. Reference to any provision of the Code shall mean such provision as in effect from time to time, as the same may be amended, and any successor provision thereto, as interpreted by any applicable regulations as in effect from time to time.

3

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 4 de 11
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 18 of 45
**EXHIBIT A**

**3.4** **"Fair Market Value of Equity Interest"** shall mean either:

**3.4.1** the value determined from multiplying the Net Profit of the last year of operations by five (5). Net Profit shall have the meaning ordinarily applied to it using Generally Accepted Accounting Methods. The Formula is described herein as Net Profit X 5 = Fair Market Value of Equity Interest, or

**3.4.2** if the Members unanimously agree to waive use of the proscribed formula in 3.4.1 above the value of an equity interest unanimously agreed to in writing by the Members (including personal representatives of deceased Members and court appointed guardians of legally incompetent Members) within thirty (30) days after an event occurs (the "Occurrence Date") that gives rise to an option to purchase or mandatory purchase of an equity interest pursuant to this Operating Agreement, or

**3.4.3** if the Members unanimously agree to waive use of the proscribed formula in 3.4.1 above, but are unable to unanimously agree on the value of an equity interest within this thirty (30) day period, the appraised value of the equity interest as of the close of business on the day following the Occurrence Date determined by the certified public accountants regularly employed by the Company (the "Appraiser"). In preparing the appraisal, among other things, the Appraiser shall consider the Net Book Value of the Company pursuant to generally accepted accounting principles, the historical earnings of the Company, the prospective earnings of the Company taking into account the event which triggered the appraisal and, if the event which gives rise to an option to purchase the equity interest pursuant to this Operating Agreement is the death of a Member, the effect that the Member's death will have on the business of the Company, as well as the amount (if any) of life insurance proceeds payable to the Company as a result of the Member's death.



**3.5** **"Operating Manager"** shall mean Bachir Mihoubi, or such other designated person with or without membership and/or Equity Interest, who succeeds him in that capacity in accordance with the provisions of this Operating Agreement.

**3.6** **"Member/s"** shall mean any person, including the Operating Manager and Luiz A. Penna, or entity that holds a Membership Interest in the Company and becomes a member of the Company in accordance with the terms of this Agreement. Each Member is the record and beneficial owner of a Membership Interest in the Company.

**3.7** **"Membership Interest"** shall mean a Member's entire interest as a Member of the Company.

**3.8** **"Other Members"** shall mean Members other than the Transferor.

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 5 de 11
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 19 of 45
**EXHIBIT A**

**3.9** **"Other Transaction"** shall mean a Transfer to another Transferee not pursuant to a Bona Fide Offer, including a Transfer by gift, but not a Transfer made in accordance with Articles 5 or 9 of this Operating Agreement.

**3.10** **"Percentage Equity Interest"** shall mean a Member's proportionate share of equity ownership in the Company subject to the provisions of Article V and Section 11.4, with respect to any Member, with the exact percentage being set forth in Article IV and opposite such Member's name on the signature page of this Agreement, as such percentages may be modified by written agreement among all Members.

**3.11** **"Profits" and "Losses"** shall have the ordinary meaning given under Generally Accepted Accounting Practices.

**3.12** **"Transferee"** shall mean the person to whom a Transferor proposed to Transfer its Membership Interest.

**3.13** **"Transfer" or "Transferred"** with respect to any Membership Interest (and whether or not such word is capitalized herein), shall mean any sale, assignment, transfer (including transfers by operation of law), pledge, hypothecation, gift, bequest or other disposition whatsoever of any Membership Interest or any portion thereof or rights therein.

**3.14** **"Transferor"** shall mean a Member attempting to Transfer some or all of its Membership Interest in the Company.



**3.15** **"Majority Interest"** shall mean interest@ 50% + 1% of the Equity Interest of the Company.

## ARTICLE IV
## COMPANY CAPITAL AND CONTRIBUTIONS

**4.1** **Contributions.** The Members have made initial contributions to the capital of the Company as follows:

Member:    Mr. Luiz A. Penna shall establish and fund for two years a yearly budget to be used by the Company for international development and administrative costs, not exceeding an aggregate amount of $150,000.00. The funding of the second year may be drawn from Luiz A. Penna's distribution. Luiz A. Penna shall be primarily responsible for the support and training of the franchisees including, without limitations, training preceding and during store opening and continuous support thereafter. Luiz A. Penna shall contribute to the Company, or cause Goodies, Inc. to contribute to the Company, the exclusive

5

license rights to use the trademarks and brand name of "Mr. Pretzels" and "Oh! My Pretzels". Luiz A. Penna shall also contribute by granting the Company, and/or causing Goodies Inc. to grant to the Company, the right to use the pretzels mix for the dough necessary to make the pretzels to be sold in the stores owned and operated by the Company as well as the ones operated by franchisees. Finally, Luiz A. Penna is contributing, or is causing Goodies, Inc. to contribute the structure, know how and good will that both the brand name and the pretzels mix carry with themselves.

Member:  Bachir Mihoubi shall contribute to the Company his time for the international franchise development of the Company.

**4.2  Additional Contributions.** No Member shall be required to make additional capital contributions to the Company unless Members agree by resolution, to require the payment of additional capital contributions by the Members.

**4.3  Percentage Equity Interest**. The Members equity ownership in the Company shall be based upon the following percentages:



**LUIZ A. PENNA**......................................................shall own fifty one percent (51%) of the Company's equity.

**BACHIR MIHOUBI**................................................shall own one percent ( 1%) per each country upon completion of a development agreement (Bachir Mihoubi shall own up to 9 % for the first nine (9) countries.) for these markets; thirty percent (30%) upon completion of development agreements in more than ten (10) countries; forty percent ( 40%) upon completion of development agreements in fifteen (15) countries; and, Forty nine percent (49%) upon completion of development agreements in twenty ( 20) countries or more.

**4.4  No Additional Equity.** No additional equity interest in the Company shall be authorized without the written consent of all the Members of the Company.

**4.5  Interest.** No Member shall receive interest on his contribution to the capital of the Company. No Member shall have the right to receive property other than cash under any circumstances requiring a return of his contribution.

**4.6** <u>**Ownership Interests.**</u> Subject to the provisions of Article V, notwithstanding that a Member shall have contributed more to capital and/or for any reason have a larger capital account than the other Member(s), unless all Members otherwise agree in writing, the Percentage Equity Interest of each Member as stated in this Agreement shall not change so long as the Member remains a Member of the Company.

**ARTICLE V**
**DISTRIBUTIONS**

**5.1** <u>**Distributions**</u>. A Member has no right to demand and receive any distribution in a form other than cash. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members except on the dissolution and winding up of the Company. The Company shall distribute every month to each Member from the Company's profits an amount of cash according to the Manner of Distribution defined below for the preceding month (the "Preceding month"), provided that:

**5.1.1** The Company has earned a net profit from the date of its organization to the end of the Preceding Month;

**5.1.2** The Company has earned a net profit from the beginning of the fiscal year to the end of the Preceding Month; and

**5.1.3** The Operating Manager or Treasurer does not project a net loss in future months during the current fiscal year that would eliminate the net profit earned in 5.1.1 or 5.1.2 above.

**5.1.4** The Company may not make a distribution of any appreciated property to a Member without the written consent of all the Members of the Company.

**5.2** <u>**Manner of Distribution.**</u> Distributions shall be made to Members in the following manner:

**LUIZ A. PENNA**......................................................shall receive fifty one percent (51%) of any distribution.

**BACHIR MIHOUBI** ...............................................shall receive forty nine percent (49%) of any distribution.

7

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 8 de 11
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 22 of 45
EXHIBIT A

**5.3** **Tax Liability.** The Company shall at all times be required to withhold or make payments to any governmental authority with respect to (i) any federal, state, local or foreign tax liability of any Member arising as a result of such Member's membership in the Company or (ii) imposed on the Company by reason of a Member being a citizen, resident or national of a state, locality or foreign jurisdiction.

**5.4.** **Company Reserves.** The Operating Manager shall establish such reserves as it, in its reasonable judgment, deems are necessary to carry out the Purposes of the Company.

## ARTICLE VI
## MANAGEMENT

**6.1** **Management.** The Members agree that they shall vote their Percentage Equity Interests in the Company to provide for the following individuals to be Managers in the capacities indicated:

| | |
|---|---|
| Operating Manager: | **BACHIR MIHOUBI** |
| Company Secretary: | Bachir Mihoubi |
| Company Treasurer: | **BACHIR MIHOUBI** |

The Operating Manager shall be the chief executive officer of the Company responsible for the general overall supervision of the business and affairs of the Company. Specifically, he shall be charged with the international development of the Company. In addition, he shall, when present, preside at all meetings of the Members. The Operating Manager may sign, on behalf of the Company, such deeds, mortgages, bonds, contracts or other instruments which have been appropriately authorized to be executed, by the Members except in cases where the signing or execution thereof shall be expressly delegated by the Member or by this Operating Agreement or by Statute to some other Officer or Agent of the Company; and, in general, he shall perform all duties as may be prescribed by the Members from time to time. Notwithstanding any provision contained elsewhere in this Agreement, neither the Operating Manager nor any other Member shall have the authority to take, and the Company shall not take, any of the following actions without a proper resolution by the Members:

**6.1.1** The sale of any of the assets of the Company to, or the merger or consolidation of the Company with, any other person or entity;

**6.1.2** The incurring of any indebtedness for borrowed money, or the giving of a guaranty of the obligation of any other person or entity;

8

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 9 de 11
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 23 of 45
**EXHIBIT A**

**6.1.3** The acquisition of any property, real or personal, except for acquisitions of supplies, equipment and other personal property in the ordinary course of business of the Company;

**6.1.4** The transfer or pledge, mortgage or grant of a security interest or other right or encumbrance of or in any part of the assets of the Company;

**6.1.5** The amendment, alteration, modification or repeal of any provision of the Company's Articles of Organization or this Agreement;

**6.1.6** The dissolution or liquidation of the Company, the confession of a judgment against the Company, an assignment for the benefit of the Company's creditors, or the filing of a petition for relief or protection from the debts of the Company under any bankruptcy or receivership proceeding;

**6.1.7** The taking of any action that would make it difficult to carry on the ordinary business of the Company; and

**6.1.8** Any other matters requiring the approval or authorization of Members under Georgia law.

**6.2** **Election and Tenure.** The managers of the Company ("Managers") shall be elected annually by the Members at the annual meeting. The managers shall hold office from the date of their election until the next annual meeting and until their successor shall have been elected, unless they shall sooner resign or be removed.

**6.3** **Resignation of the Operating Manager.** If the Operating Manager resigns for any reason whatsoever, the Company or the other Members of the Company in their capacity as member pro rata basis shall have the option to purchase all of the Membership Interest then owned by the Operating Manager at the fair market value of his Equity Interest as defined in Article III above.

**6.4** **Vacancies.** A vacancy in any office may be filled for the un-expired portion of the term by the Members at the fair market value of its specific interest as defined in Article III.

**6.5** **Salaries.** The salaries of the Managers may be fixed from time to time by the Members.

**6.6** **Operating Manager Powers and Responsibilities.** Subject to the limitations set forth in Section 6.1, the Operating Manager shall have full charge of, and be responsible for, the international development of the Company. The Operating Manager shall devote such amount of his time and energy as shall be necessary to manage the business and affairs of the Company. The Operating Manager's authority as the Operating Manager shall be exercised subject to the ultimate direction and authority of the Members; but subject to such limitation,

and the limitations set forth in Section 6.1, the Operating Manager shall have full and complete power and authority to do, on behalf of the Company, any one or more of the following in connection with the Company's business, properties or affairs:

**6.6.1**    The Operating Manager shall implement this Operating Agreement and the resolutions and the decisions of the Members.

**6.6.2**    The Operating Manager shall supervise the international development of the Company.

**6.6.3**    The Operating Manager, within such parameters as may be set by the Members, shall establish such charges for services and products of the Company as may be necessary to provide adequate income for the efficient operation of the Company.

**6.6.4**    The Operating Manager, within the budget established by the Members, shall set and adjust wages and rates of pay for all personnel of the Company and shall appoint, hire and dismiss all personnel and regulate their hours of work.

**6.6.5**    The Operating Manager shall keep the Members advised in all matters pertaining to the international development of the Company, services rendered, operating income and expense, financial position, and, to this end, shall prepare and submit a report to the Members at each regular meeting and at other times as may be directed by the Members.

**6.6.6**    The Operating Manager may take any actions which the Operating Manager deems necessary or appropriate in connection with any of the foregoing.

**6.6.7**    The Operating Manager may delegate any specific authority or responsibility to its managers, members, officers, agents, or affiliates, unless otherwise prohibited or restricted by the members in a majority basis.

**6.6.8**    The Members may authorize any Member or agent of the Company, in addition to the Operating Manager, to enter into any contract or execute any instrument in the name of and on behalf of the Company, and such authority may be general or confined to specific instances.

**6.7**    <u>**Other Officers.**</u>    The Company may, at the discretion of the Members, have additional officers including, but not limited to, one (1) Secretary and one (1) Treasurer. One (1) person may hold two (2) or more offices. When the incumbent of an office is (as determined by the incumbent himself or by the Members) unable to perform the duties thereof, or when there is no incumbent of an office (both such situations referred to hereafter as the "absence" of the Officer), the duties of the officer shall be performed by the person specified by the Members.

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 11 de 11
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 25 of 45
EXHIBIT A

**6.8    No family Members Allowed.**  No family members of any of the Members will be allowed to work in any capacity whatsoever in the Company (neither as officers or employees) unless approved by proper resolution by the Members.

**6.9    Members' Rights.** Each Member, including the Operating Manager, shall have the right to engage in other activities and businesses excluding those that compete with the business of the Company.

**6.10    Standard of Care.** The management, conduct, operation and control of the Company's business and affairs shall be at the expense and risk of the Company and not at the expense or risk of any Member. No Member, including the Operating Manager and any manager, officer or agent appointed by the Members or the Operating Manager, shall be liable or obligated to the Company or to any of its Members for any mistake of fact or judgment or for the doing of any act or the failure to do any act by such Member, Operating Manager, manager, officer or agent in conducting the business and affairs of the Company, which may cause or result in any loss or damage to the Company or any of its Members. The Members and Operating Manager shall perform their duties as Members, and in the case of the Operating Manager as manager, in a manner he, she or it reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A person who performs his, her or its duties in accordance with this paragraph shall not have any liability by reason of being or having been a Member, Operating Manager, manager, officer or agent. The Operating Manager (including its managers, members, officers, directors, employees and agents) will not be liable to the Company or the Members or others, except by reason of acts constituting fraud, willful misconduct, gross negligence or breach of fiduciary duty.

**6.11    Withdrawal of Member.**  Members shall have the unilateral right to resign or withdraw at any time from the Company.  A Member is required to give thirty (30) days written notice to each of the other Members to initiate a withdrawal.  Upon withdrawal, the withdrawing Member shall receive the Withdrawal Compensation Amount to be paid within one (1) year of the effective date of the Member's withdrawal.   The Withdrawal Compensation Amount for the purpose of this Section  6.11 shall be the fair market value of the withdrawing member's interest in the LLC, as defined in article 3.4 above. Upon withdrawal, the withdrawing Member shall have no continuing obligation to the Company pursuant to any law, this Agreement or other applicable laws or such obligations as expressly assumed by such Members.  A withdrawing Member shall retain the right to vote as Member up until the effective date of his or her withdrawal and the person who has withdrawn shall no longer be considered a Member.

**6.12    Death of Member.**  Upon the death of a Member, the remaining Members shall cause a prompt preparation of financial statement for the Company as of the end of the month in which the Member died which shall be the effective date of death for the deceased Member for accounting purposes under this Agreement.  The estate of the deceased Member

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 1 de 17
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 26 of 45
**EXHIBIT A**

shall receive the Death Compensation Amount to be paid within two (2) years of the effective date of the Member's death. The "Death Compensation Amount" for the purpose of this Section 6.12 is defined as an amount agreed upon between a majority in interest of the remaining Members and the estate of the deceased Member as the Fair Market Value for the deceased Member's interests in the Company.

**6.13** <u>**Involuntary Withdrawal**</u>. A Member may be removed at any time (1) with cause by a vote of a majority of all Members eligible to vote, or (2) should a court of law of the Commonwealth or Puerto Rico find that a Member failed to contribute to the Company as set forth in Section 4.1. hereof. Should a Member be removed as a member of the Company pursuant to the terms and provisions hereof, all of its Membership Interest shall be repurchased by the other members in a pro-rata basis or if they are not interested, then by the Company. The amount to pay to the removed Member as of the date of determination shall be conclusively deemed to be the Fair Value of all of its Membership Interest as defined in article 3.4 above, and the payment provided for in this Section 6.13, shall be the full and only consideration for the redemption of the removed Members' Membership Interest. In the event of involuntary withdrawal as provided herein, the removed Member shall be barred from attempting to terminate, from terminating, from causing to attempt to terminate, and from causing to terminate any license granted to the Company pursuant hereto or in furtherance hereof.

## ARTICLE VII
## LIMITATION OF LIABILITY; INDEMNIFICATION

**7.1** <u>**Limitation of Liability of Operating Manager.**</u> The Members hereby acknowledge and agree that the liability of a Member, including the Operating Manager (provided it complies with the standards set forth in Section 6.9), to the Company or to any of the other Members shall be limited to the maximum extent permissible under the Act.

**7.2** <u>**Indemnification by Company.**</u> To the maximum extent permissible under the Act, and subject to the standards set forth in Section 6.6, the Company shall indemnify any person who was or is a party to any proceeding, including a proceeding brought by a Member on behalf of the Company or brought by or on behalf of the Members of the Company by reason of the fact that such person is or was a Member of the Company, a Operating Manager, or serving at the request of the Company as a manager, officer, employee, or agent of the Company or as a manager, director, trustee, partner or officer of another limited liability company, corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, against any liability and reasonable expenses (including reasonable attorneys' fees) incurred by such person in connection with such proceeding unless he has engaged in willful misconduct or a knowing violation of the criminal law. The Company will, to the fullest extent permitted by law, indemnify, defend and hold harmless the Operating Manager (including its managers, members, officers, directors, employees and agents) against any and

12

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 2 de 17
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 27 of 45

**EXHIBIT A**

all claims, actions, causes of action, suits, proceedings, losses, damage, liability, costs and expenses (including, without limitation, attorneys' fees and expenses, and court costs) with respect to any acts or omissions of the Operating Manager made in accordance with the standards of Section 6.6. Any such indemnification shall be made only out of the assets of the Company and not from any Members. No amendment or repeal of this Section 7.2 shall have any effect on the rights provided herein with respect to any act or omission occurring prior to such amendment or repeal.

**7.3**     **Indemnification by Member**.  Any Member who is in violation of this Operating Agreement agrees to indemnify and hold the Company and the Other Members harmless from all costs and expenses, including reasonable attorneys' fees (whether or not mediation, arbitration or suit is instituted and if mediation, arbitration or suit is commenced, attorneys' fees at the trial and appellate levels) and court costs, incurred by the Company and/or Other Members as a result of the violation of this Operating Agreement.  The Company shall fund the indemnification obligations provided herein in such a manner and to such extent as the Members may from time to time deem proper.

**ARTICLE VIII**
**ACTION BY THE MEMBERS**

**8.1**     **Voting.** Each Member shall have one (1) vote for each percentage point of the Percentage Equity Interest (a fractional Percentage Interest shall have a corresponding fractional vote) then held by the Member. Except as otherwise provided herein, action on a matter shall be approved if a majority of all Percentage Equity Interests voted in favor of the action, unless a greater vote is required by this Agreement or by law.

**8.2**     **Meetings.**  Unless otherwise agreed in writing, the annual meeting of the Members shall be held no sooner than the third Tuesday in the month of January in each year, beginning with the year after organization at the hour of 10:00 o'clock a.m., for the purpose of electing an Operating Manager and for the transaction of such other business as may come before the meeting.  If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day.  If the election shall not be held on the day designated herein for the annual meeting of the Members, or at any adjournment thereof, the Members shall cause the election to be held at a special meeting of the Members as soon thereafter as it may conveniently be held.

**8.2.1**     The Members may by resolution prescribe the time and place for the holding of regular meetings and may provide that the adoption of such resolution shall constitute notice of such regular meetings.  If the Members do not prescribe the time and place for the holding of regular meetings, such regular meetings shall be held at the time and place specified by the Operating Manager in the notice of each such regular meeting.

13

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 3 de 17
Case 3:25-cv-01323    Document 1-1    Filed 06/14/25    Page 28 of 45

**EXHIBIT A**

**8.2.2**  Special meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called by the Operating Manager or by the Members holding a Majority Interest.

**8.2.3**  Written, electronical, telephonic or facsimile notice stating the place, day and hour of the meeting and, in case of a special meeting, the purposes for which the meeting is called, shall be delivered not less than three (3) days before the date of the meeting, either personally or by mail, by or at the direction of the Operating Manager, to each Member of record entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the Member at his address as it appears on the books of the Company, with postage thereon prepaid.  When all the Members of the Company are present at any meeting, or if those not present sign in writing a waiver of notice of such meeting, or subsequently ratify all the proceedings thereof, the transactions of such meeting are as valid as if the meeting were formally called and notice had been given.

**8.2.4**  At any meeting of the Members, all of the Percentage Equity Interests, represented in person or by proxy, shall constitute a quorum at a meeting of Members.  If quorum is not met at any so called meetings, subsequent meetings for the same purpose could be notified in which case fifty one percent (51%) of the total percentage equity interest of the Company will constitute quorum. At such subsequent meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough Members to leave less than a quorum.

**8.2.5**  At all meetings of Members, a Member may vote by proxy executed in writing by the Member or by his duly authorized attorney-in-fact.  Such proxy shall be filed with the Operating Manager of the Company before or at the time of the meeting.  No proxy shall be valid after three months from date of execution, unless otherwise provided in the proxy.

**8.2.6**  Membership Certificates standing in the name of a corporation, partnership or company may be voted by such officer, partner, agent or proxy as the Bylaws of such entity may prescribe or, in the absence of such provision, as the Board of Directors of such entity may determine. Membership Certificates held by a trustee, personal representative, administrator, executor, guardian or conservator may be voted by him, either in person or by proxy, without a transfer of such certificates into his name.

**8.2.7**  Ordinarily, the act of a majority of the Members present at a meeting at which a quorum is present shall be the act of the Members.  Upon demand of any Member,

14

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 4 de 17
Case 3:25-cv-01323   Document 1-1   Filed 06/14/25   Page 29 of 45
**EXHIBIT A**

voting on a particular issue may be in accordance with percentage of equity ownership in the company.

**8.2.8** The Operating Manager of the Company shall preside at meetings of the Members and may move or second any item of business but shall not vote upon any matter when there is an even number of Members present and the Members are evenly divided as to an issue. A record shall be maintained of the meetings of the Members. The Members may adopt their own rules of procedure, which shall not be inconsistent with this Operating Agreement.

**8.2.9** A Member of the Company who is present at a meeting of the Members at which action on any matter is taken shall be presumed to have assented to the action taken, unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by certified mail to the secretary of the meeting immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Member who voted in favor of such action.

**8.2.10** Unless otherwise provided by law, any action required to be taken at a meeting of the Members, or any other action which may be taken at a meeting of the Members, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all the Members entitled to vote with respect to the subject letter thereof.



**8.3.** <u>**Order of Business.**</u> Unless the Members present at the meeting decide otherwise, the order of business at all meetings of the Members shall be as follows:

      1.    Roll Call.
      2.    Proof of notice of meeting or waiver of notice.
      3.    Reading of minutes of preceding meeting.
      4.    Report of the Operating Manager.
      5.    Reports of Committees.
      6.    Unfinished Business.
      7.    New Business.

**8.4.** <u>**Telephonic Meeting.**</u> Members of the Company may participate in any meeting of the Members by means of conference telephone or similar communication if all persons participating in such meeting can hear one another for the entire discussion of the matter(s) to be voted upon. Participating in a meeting pursuant to this Section shall constitute presence in a person at such meeting.

**8.5** <u>**Action Without Meeting.**</u> Any action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is taken by written consent of

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 5 de 17
Case 3:25-cv-01323   Document 1-1   Filed 06/14/25   Page 30 of 45
**EXHIBIT A**

Members holding the number of outstanding Percentage Equity Interests necessary for the action and entitled to vote thereon. Such action without meeting shall be evidenced by one (1) or more written consents to be filed with the Company's records.

**8.6**    **Insurance.**   The Members may cause the Company to purchase and maintain insurance for the Company or its Members and officers on behalf of any person who is or was or has agreed to become a Member or officer advisory committee member or agent of the Company or is or was serving at the request of the Company as a manager, director, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred in any such capacity or arising out of such status, whether or not the Company would have the power to indemnify such person.

**ARTICLE IX**
**NON-TRANSFERABILITY OF INTEREST**

**9.1**    **Transfer Restrictions.**   Except as expressly provided in Section 9.2, and subject to the restrictions stated herein, the Members shall not transfer any portion of their Membership Interests or rights therein.

**9.2**    **Permitted Transfers.**  Subject to the restrictions stated herein, each Member shall be permitted to transfer all or any portion of its Membership Interest to (i) another Member or to the Company, or (ii) to a corporation or limited liability company that is majority-owned by another Member; provided, however, that in all such cases each transferee agrees in writing to become bound by all of the terms of, and a party to, this Operating Agreement.

**9.3**    **Restrictions on Transfer**.  Unless approved by the member(s) holding the majority interest in the company in writing during the term of this Operating Agreement, no Membership Interest now owned or later acquired by a Member may be assigned or transferred to anyone not already a Member in the Company unless all of the following conditions are met:

   **9.3.1**   The Transfer complies with all applicable provisions in this Operating Agreement.

   **9.3.2**   The Proposed Transferee delivers to the Company a written acknowledgment that the equity interest to be received by the proposed Transfer are subject to this Operating Agreement and that the Proposed Transferee and its successors in interest are bound by the terms of this Operating Agreement.

   **9.3.3**   All transfers of any equity interests whether in whole or part shall first be approved in writing by the member(s) holding the majority interest in the company.

16

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 6 de 17
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 31 of 45
**EXHIBIT A**

**9.3.4**    The Transfer complies with the Securities Act of 1933, the Securities and Exchange Act of 1934, and all applicable state securities laws, unless the Transfer is exempt from the requirements of these laws.

All attempted Transfers other than in accordance with this Operating Agreement shall be null and void.  The Company shall refuse to recognize those attempted Transfers and shall not reflect on its records the proposed changes in record ownership of equity interest transferred pursuant to those attempted Transfers.

**9.4**    **Rights of First Refusal**.  If a Transferor receives a Bona Fide Offer to Transfer all or some of its equity interest (the "Offered equity interest"), and the Transferor desires to Transfer the Offered equity interest to the Proposed Transferee, or if the Transferor desires to Transfer the Offered equity interest to a Proposed Transferee pursuant to an Other Transaction, the Transferor shall first offer for sale to the Company and the Other Members the Offered equity interest in accordance with the following procedures:

**9.4.1**    The Transferor shall deliver a notice of the proposed Transfer (the "Transfer Notice") to the Company and the Other Members.  The Transfer Notice shall contain a description and the terms of the proposed transaction, including the amount of the Offered equity interest, the name of the Proposed Transferee, a description of the consideration to be received by the Transferor for the Offered equity interest, and all information that is available to the Transferor regarding the Proposed Transferee's business experience and financial condition.  If the Transfer is to be made pursuant to a Bona Fide Offer, the Transfer Notice shall also include a copy of the Bona Fide Offer, or a complete description of the terms of the Other Transaction.

**9.4.2**    Simultaneously with the delivery of the Transfer Notice, the Transferor shall deliver an offer (the "Offer") to sell pro rata the Offered equity interest to the Company and to each of the Other Members.

**9.4.3**    If the Transfer is to be made pursuant to a Bona Fide Offer, the Offer shall contain the same terms and conditions and shall be for the same consideration as described in the Bona Fide Offer.

**9.4.4**    If the Transfer is to be made pursuant to an Other Transaction, the purchase price per share shall be equal to the Fair Market Value Per Share and shall be paid on the terms and conditions specified in Section 9.4.8.

**9.4.5**    The Company shall have the right to purchase all or some of the offered equity interest proposed to be Transferred if, within twenty (20) days after the receipt by the Company of the Offer, the Company delivers written notice to the Transferor and to the Other Members stating the number of the offered equity interest the Company intends to purchase.  If the Company elects to purchase less than all of the

17

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 7 de 17
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 32 of 45
**EXHIBIT A**

offered equity interest, the acceptance of the Offer by the Company shall be effective only if the Other Members elect to purchase the remaining offered equity interest in accordance with Section 9.4.6.

**9.4.6** If the Company fails to exercise its option for all the offered equity interests, the Other Members shall have an additional 10 days to accept (on a pro rata basis) the Offer as to all of the remaining offered equity interest by delivering written notice to the Transferor (the "Acceptance Notice"). If any of the Other Members do not accept the Offer, the Transferor shall make an additional Offer of the remainder of the offered equity interest to those Other Members (if any) who have accepted the Offer. The additional Offer shall be made for a period of ten (10) days and shall be made pro rata to each of the Other Members who have accepted the Offer.

**9.4.7** If the Company or the Other Members exercise options to purchase all of the offered equity interest, the date for the closing (the "Closing Date") of the purchase shall be no later than sixty (60) days after the date of the Offer, unless that date falls on a Saturday, Sunday or legal holiday, in which case it shall be on the next succeeding business day.

**9.4.8** If the Company or the other Members do not agree to purchase all of the Offered equity interest, the Transferor shall have the right to cancel the Offer and to Transfer the Offered equity interest to the Proposed Transferee named in the Transfer Notice, but only in strict accordance with the terms and for the consideration stated in the Transfer Notice. If the Transferor does not Transfer the Offered equity interest to the Proposed Transferee in accordance with the Transfer Notice within thirty (30) days after the Closing Date, all of the restrictions on Transfer set forth in this Operating Agreement shall again be in effect with respect to the Offered equity interest, and the Transferor shall again comply with all of the provisions of this Section prior to Transferring any equity interest.

**9.6**     **Effect of Transfer.** Any Membership Interest transferred to a transferee pursuant to this Article IX shall continue to be subject to the provisions of this Agreement, and the Company shall not be obligated to recognize any Membership Interest in the name of such Transferee unless and until it shall have agreed in writing to become bound by such provisions. Any person who is the transferee of all or any portion of the Membership Interest as permitted hereby but does not become a substituted Member and who desires to make a further transfer or assignment of all or any portion of such interest, shall be subject to all of the provisions of this Article IX to the same extent and in the same manner as any Member desiring to make a transfer or assignment of all or any portion of its interest.

**9.7**     **Compliance with Loan Covenants; Pledges, Mortgages and Security Interests.**
Notwithstanding anything to the contrary set forth in this Article IX, (i) no Member shall be permitted to transfer any portion of its Membership Interest or any beneficial interest therein, if such transfer will cause the Company to be in breach of any covenant or obligation set

18

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 8 de 17
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 33 of 45
**EXHIBIT A**

forth in any documentation evidencing, securing or otherwise pertaining to any loans obtained by the Company from third parties, and (ii) no Member shall be permitted to pledge, mortgage, or grant a security interest in any portion of his Membership Interest without the prior written consent of the Company and the Operating Manager.

# ARTICLE X
# COMPANY RECORDS

**10.1    Company Books and Records.** The Company shall maintain accurate books of the affairs of the Company. The books and records of the company shall be kept at the principal office of the Company or at such other places, within or without the State of Georgia, using such methods as may be approved from time to time by a majority of the Members.

**10.2    Financial Records.** All financial records shall be maintained and reported based on generally accepted accounting practices (GAAP). The Company shall at all times accord to investments fair and equitable treatment and full protection and security, and shall in no case accord less favourable treatment than that required.



**10.3    Right of Inspection.** Any Member of record shall have the right to examine, at any reasonable time or times for all purpose, the books and records of account, minutes and records of Members and to make copies thereof. Any agent or attorney of the Member may make such inspection. Upon the written request of any Member of the Company, it shall mail to such Member its most recent financial statements, showing in reasonable detail its assets and liabilities and the results of its operations.

**10.4    Banking.** The Company shall maintain a bank account in which all funds of the Company shall be deposited. This account may not be co-mingled with other accounts. The Company's funds shall be used solely for the business of the Company.

**10.5    Deposits.** All funds of the Company shall be deposited from time to time to credit of the Company in such banks, trust companies or other depositories as the Members may select.

**10.6    Bank Disbursement Authorization**. On all disbursements made from any Company Bank Account(s) the signature of the Operating Manager shall be required.

**10.7    Tax Classification.** It is the intention of the Members that the Company be initially classified as a partnership for Federal and state income tax purposes. The Members may agree to change the tax treatment of the Company by signing, or authorizing the signature of, IRS Form 8832, Entity Classification Election, and filing it within the proscribed time limits with the IRS and, if applicable, the state tax department.

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 9 de 17
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 34 of 45
EXHIBIT A

**10.8   Fiscal Matters.** The fiscal year of the Company shall be based upon the calendar year and shall begin on the first day of January and end on the last day of December each year, unless otherwise determined by resolution of the Members. The Company shall use the "Cash" Method of accounting, unless otherwise determined by resolution of the Members.

## ARTICLE XI
## DISSOLUTION AND TERMINATION

**11.1   Dissolution.** Subject to Section 11.2, this Operating Agreement shall terminate and the Company shall be dissolved and liquidated upon the earlier of the following: (i) cessation of the Company's business; (ii) the entry of a decree of judicial dissolution; (iii) the expiration of the stated term; (iv) the voluntary agreement of all of the parties bound by the terms of this Operating Agreement.   Upon dissolution, the Members shall wind up the affairs of the Company and distribute its assets of proceeds thereof in accordance with this Agreement. A reasonable time as determined by the Members, but not to exceed eighteen (18) months, shall be allowed for the orderly liquidation and distribution of the assets of the Company.

**11.2   Continuation Upon Withdrawal of Member.** The Members shall have the right to continue the Company upon a withdrawal, as long as the remaining Member(s) holding a Majority Interest in all percentage equity agree to continue the Company after the withdrawal of a Member.

**11.3   Distributions.** Upon the liquidation of the Company, the net proceeds associated with liquidating the Company and any undistributed cash or other assets of the Company shall be distributed as follows:

**11.3.1** First, to the payment and discharge of all of the Company's debts and liabilities to creditors other than Members;

**11.3.1** Second, to the payment and discharge of all of the Company's debts and liabilities, if any, to Members;

**11.3.1** Third, to Members in accordance with Article V.

The Operating Manager shall not be personally liable for the return or repayment of all or any portion of the contributions of any Member; any such return or repayment shall be made solely from assets of the Company.

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 10 de 17
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 35 of 45
**EXHIBIT A**

## ARTICLE XII
## GENERAL PROVISIONS

**12.1** **Additional Members.** No person or entity shall be added as a Member of the Company without the unanimous written consent of all Members.

**12.2** **Restriction on Membership Certificate**. All certificates for Membership of the Company owned by the Members or their Transferees shall be endorsed with the following statement:

> "*The equity interest represented by this certificate is subject to the terms of an Operating Agreement dated March 22, 2007, a copy of which is on file at the principal office of the Company and may be obtained from the Secretary of the Company. By accepting this Certificate, the registered holder agrees to be bound by all terms and conditions of the aforementioned Operating Agreement dated March 22, 2007*".

**12.3** **Investment**. The Members acknowledge that they have, or will acquire, their equity interests in the Company for investment and not for the purpose of distribution.

**12.4** **Company Information**. The Members acknowledge that before purchasing their equity interests in the Company they were given access to information regarding the Company, and that they made an informed decision to become Members.

**12.5** **Non-Disclosure of Confidential Information**. Members shall not (otherwise than in the proper performance of employment for the Company), without the prior written consent of the Company disclose to any person, firm pr company, whether or not a competitor of the Company, and shall during the ownership of an equity interest in the Company, use its, his or her best efforts to prevent the publication or disclosure of, any information concerning the business, assets, accounts or finances of the Company or any of the secrets, dealings, transactions or affairs of the Company, including, but not limited to, trade secrets, costs, pricing practices, customer lists, financial data, employee information or information as to the organization structure, which have or may come to his or her knowledge during the ownership of equity interest in the Company, or previously or otherwise. Members shall use his or her best efforts to cause its, his or her representatives, attorneys, accountants and advisors to whom information is disclosed to comply with the provisions of this Section. At any time the Operating Manager of the Company may reasonably request, Members shall forthwith surrender to the Company all documents and copies of documents in their possession relating to the foregoing, including, but not limited to, internal and external business forms, manuals, correspondence, notes, customer lists and computer programs, and Member shall not make or retain any copy or extract of any of the foregoing. The Members' obligations hereunder shall not apply to such portions of the Confidential Information which (i) are or become generally available to the public (other than as a result of a disclosure by a

21

receiving party or its representatives in violation of this Agreement or any other obligations of such person or entity), (ii) are or become available to the receiving party on a non-confidential basis from a source which is entitled to disclose it, (iii) are in the possession of the receiving party prior to the date hereof and which were not acquired or obtained from the Company, or (iv) are developed independently by the receiving party.

**12.6    Intellectual Property**.    Any new idea, invention, improvement, patentable, trademarkable or copyrightable work created by or developed in whole or in part by a Member related to the business of the Company or at the request of the Company, will promptly be disclosed and explained by Member to the Company, and all rights to such ideas, inventions, improvements, patentable, trademarkable or copyrightable works shall be promptly assigned by the Member to the Company without additional compensation.

**12.7    Investment Representations.** The parties to this Agreement agree as follows with respect to investment representations:

**The undersigned Members understand and expressly agree:**



> **12.7.1  that the Membership Interests evidenced by this Agreement have not been registered under the Securities Act of 1993, 15 U.S.C. §77a et seq., or any other federal or state securities law (together the "Securities Act") and that the Company is issuing these Membership Interests in reliance upon the exemptions from the registration requirements of the Securities Acts providing for issuance of securities not involving a public offering;**

> **12.7.2  that the Company has relied upon the fact that a Membership Interest is to be held by each Member for investment; and**

> **12.7.3  that exemption from registration under the Securities Acts would not be available if a Membership Interest was acquired by a Member with a view to distribution.**

> **12.7.4  Accordingly, each Member hereby confirms to the Company that the Membership is acquiring the Membership Interest for the Members' own account, for investment and not with a view to resale or distribution.**

> **12.7.5  In addition to the other restrictions set forth herein, each Member agrees not to transfer, sell or offer for sale any portion of its Membership Interest unless there is an effective registration or other qualification relating thereto under the Securities Act or unless the holder of the Membership Interest delivers to the Company an opinion of counsel, satisfactory to the Company, that the registration or other qualification under the Securities Act is not required in connection with the transfer, offer or sale.**

22

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 12 de 17
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 37 of 45

EXHIBIT A

**12.7.6 Each Member understands that the Company is under no obligation to register the Membership Interests or to assist the Member in complying with any exemption from registration under the Securities Acts if the Member should at a later date wish to dispose of its Membership Interest.**

**12.7.7 Before acquiring a Membership Interest, each Member has investigated the Company and its business and has made available to each Member all information necessary for the Member to make an informed decision to acquire the Membership Interest. Each Member considers itself to be an entity possessing experience and sophistication as an investor adequate for the evaluation of the merits and risks of the Members' investment in the Membership Interest.**

**12.8 Non-Impairment of Goodwill**. During ownership of an equity interest in the Company, and thereafter, a Member shall not disparage, in any manner or respect, the Company or the Company's financial soundness and responsibility, personnel or practices.

**12.9 Non-Competition**. During the ownership of an equity interest in the Company, and upon the sale or transfer of Member's equity interest, Member shall not for a period of three (3) years after such ownership of equity interest in the Company:

**12.9.1** directly or indirectly, with or without compensation, engage in, be employed by or have any interest (whether as Member, director, officer, employee, subcontractor, partner, consultant, proprietor, agent or otherwise) in any business, company or firm engaged in a business similar to the Company within the territories where the Company owns and operates or franchise stores. Notwithstanding the above, Members shall have the right to offer consultation services to non-competing concepts with regards to franchising and licensing, including, without limitations, international development services.

provided that nothing herein contained shall prevent Members from being the holder or beneficial owner for investment purposes of not more than one percent (1%) of any class of securities listed on any national securities exchange or regularly traded in any national securities market (attribute to Member for purposes of this provision any securities beneficially owned by Member's spouse, children, parents or parent's issue).

**12.10 Non-Solicitation**. Upon the sale or transfer of ownership of the Member's equity interest in the Company, Member shall not for a period of three (3) years thereafter either personally or by any means and whether for the Member or on behalf of any other person, company or firm:

23

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 13 de 17
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 38 of 45
**EXHIBIT A**

**12.10.1** canvas or solicit business (for any business similar to that engaged in by the Company at the time of sale or transfer of equity interest) from any person, company or firm who is at the time of such sale or transfer of equity interest or has been at any time within two (2) years prior to such sale or transfer of equity interest a customer of the Company with whom the Member had communication at any time within two years preceding the date of such sale or transfer of ownership of shares in the Company; or

**12.10.2** arrange or assist in the employment of any employee of the Company or otherwise induce any employee of the Company to leave the Company's employment.

**12.11** **Mediation and Arbitration**. Any disputes between the parties hereto, whether arising under this agreement or otherwise, which the parties cannot resolve between themselves using good faith shall be:

**12.11.1** Referred to a court certified mediator in San Juan , Puerto Rico, and any mediation shall be held in San Juan , the Commonwealth of Puerto Rico. The parties shall share equally in the cost of said mediation.

**12.11.2** In the event that said dispute is not resolved in mediation, the parties shall submit the dispute to a neutral arbitrator residing in San Juan, the Commonwealth of Puerto Rico.. The arbitration shall be held in San Juan, Puerto Rico. The parties shall share equally in the cost of said arbitration. In the event that the parties are unable to agree upon an arbitrator within fifteen (15) days of the date on which either party requests arbitration of a matter, the arbitrator shall be provided by the American Arbitration Association. The parties further agree that full discovery shall be allowed to each party to the arbitration and a written award shall be entered forthwith. Any and all types of relief that would otherwise be available in Court shall be available to both parties in the arbitration. The decision of the arbitrator shall be final and binding. Arbitration shall be the exclusive legal remedy of the parties. Judgment upon the award may be entered in any court of competent jurisdiction pursuant to the laws of the Commonwealth of Puerto Rico.

**12.11.3** If either party refuses to comply with a ruling or decision of the arbitrator and a lawsuit is brought to enforce said ruling or decision, it is agreed that the party not complying with the ruling or decision of the arbitrator shall pay the court costs and reasonable attorney's fees (including Trial and Appellate attorney's fees) incurred in enforcing the ruling or decision of the arbitrator.

**12.11.4** Any rights of injunctive relief shall be in addition to and not in derogation or limitation of any other legal rights.

24

**12.12** <u>Notices.</u> Any notice, demand or other communication required or permitted by this Agreement must be in writing and shall be deemed to have been given and received:

    **12.12.1** if delivered by overnight delivery service or messenger, when delivered, or

    **12.12.2** if mailed, on the third business day after deposit in the United States mail, certified or registered postage prepaid, return receipt requested, or

    **12.12.3** if faxed, telexed or telegraphed, twenty-four hours after being dispatched by fax, telegram or telex; in every case addressed to the party to be notified as follows:



If to Company:    **MR. PRETZELS INTERNATIONAL, LLC**
419 Allison Drive
Atlanta, GA 30342
Tel: (404) 233-9808
Attention: Registered Agent

If to Operating Manager:    **BACHIR MIHOUBI**
419 Allison Drive
Atlanta, GA 30342
Tel: (404) 233-9808

If to Members:    **LUIZ A. PENNA**
Con Villas Del Mar
Este APT 11.1
San Juan , Puerto Rico
Tel: (787) 723-5630
Fax: (787) 723-5630
Attention: Luiz A. Penna

**12.13** <u>Interpretation.</u> When the context in which words are used in this Agreement so indicates, words in the singular number shall include the plural, and vice versa, and words in the masculine gender shall include the feminine and neuter genders, and vice versa. The term *"person"* and pronouns shall include an individual, corporation, partnership, limited liability Company, or other entity. Reference to a statute shall also be deemed to refer to successor provisions thereof.

**12.14** <u>Entire Agreement; Amendments.</u> This Agreement contains the entire understanding among the Members and supersedes all prior written and oral agreements among them regarding the subject matter of this Agreement. No representation, agreement, arrangement or undertaking, oral or written, exists among the Members relating to the subject matter of this Agreement that is not full expressed herein. All amendments to this Agreement must be made in writing and unanimously approved by the Members. If this Agreement is amended in

25

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 15 de 17
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 40 of 45
**EXHIBIT A**

accordance with this Section, each of the Members shall sign all documents that may be necessary or desirable, including, without limitation, an amended Agreement and amended Certificate of Formation.

**12.15  Captions and Headings.** Any section or paragraph title or caption contained in this Agreement is for convenience of reference only, and shall not be deemed a part of or construed to affect the meaning of this Agreement.

**12.16  Registered Office and Agent.** The Company shall at all times have a registered office and a registered agent.

**12.17  Modification.** No change or modification of this Operating Agreement shall be valid unless it is in writing and signed by all the parties who are bound by the terms of this Operating Agreement.

**12.18  Accountant.** An Accountant may be selected from time to time by the Members to perform such tax and accounting services as may, from time to time be required.  The accountant may be removed by the Members without assigning any cause.

**12.19  Legal Counsel.** One or more Attorney(s) at Law may be selected from time to time by the Members to review the legal affairs of the Company and to perform such other services as may be required and to report to the Members with respect thereto.  The Legal Counsel may be removed by the Members without assigning any cause.

**12.20  Membership Certificates.** Membership Certificates representing equity interest in the Company shall be in such form as shall be determined by the Members.  Such Membership Certificates shall be signed by the Operating Manager and by the Company Secretary.  All Membership Certificates shall be consecutively numbered or otherwise identified.  The name and address of the person to whom the Membership Certificates are issued, with the Capital Contribution and the date of issue, shall be entered in the Membership Certificate Register of the Company.  In the case of a lost, destroyed or mutilated Membership Certificate, a new one may be issued upon such terms and indemnity to the Company as the Members may prescribe.

**12.21  Waiver of Notice.** Whenever any notice is required to be given pursuant to the provisions of the Statute, the Articles of Organization of the Company or this Operating Agreement, a waiver thereof, in writing, signed by the persons entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**12.22  Duality of Interest Transactions.** Members of this Company have a duty of undivided loyalty to this Company in all matters affecting this Company's interests.

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 16 de 17
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 41 of 45
**EXHIBIT A**

**12.23** <u>Anticipated Transactions.</u> It is anticipated that the Members and Officers will have other legal and financial relationships. Representatives of this Company, along with representatives of other entities, may from time to time, participate in the joint development of contracts and transactions designed to be fair and reasonable to each participant and to afford an aggregate benefit to all participants. Therefore, it is anticipated that this Company will desire to participate in such contracts and transactions and, after ordinary review for reasonableness, that the participation of the Company in such contracts and transactions may be authorized by the Members.

**12.24** <u>Reimbursement of Members.</u> Members shall receive reimbursement for expenses reasonably incurred in the performance of their duties.

**12.25** <u>Severability.</u> If any provision of this Operating Agreement is held invalid, unenforceable, or void by a court of competent jurisdiction, this Operating Agreement shall be considered divisible as to such provision, and the remainder of the Operating Agreement shall be valid and binding as though such provision were not included in this Operating Agreement.

**12.26** <u>Benefits; Binding Effects.</u> This Operating Agreement shall be binding upon and shall operate for the benefit of the Company, its Members and their respective executors, administrators, successors, and assigns.

**12.27** <u>Venue and Jurisdiction.</u> Should a lawsuit be necessary to enforce this Operating Agreement the parties agree that jurisdiction and venue shall be in San Juan , Puerto Rico.

**12.28** <u>No-Waivers.</u> The waiver by any party of any other party's breach of any provision of this Operating Agreement shall not operate nor be construed as a waiver of any subsequent breach, and the waiver by the party to exercise any right or remedy shall not operate nor be construed as a waiver or bar to the exercise of such right or remedy upon the occurrence of any subsequent breach.

**12.29** <u>Governing Law.</u> This Operating Agreement shall be governed by the laws of the Commonwealth of Puerto Rico (without regard to the laws that might be applicable under principles of conflicts of law) as to all matters, including, but not limited to, matters of validity, construction, effect and performance. Each Member shall have the right to petition any court of the Commonwealth of Puerto Rico (1) to acknowledge a violation hereof, or (2) to enjoin a violation or order the performance hereof, including, without limitations, Sections 4.1 and 6.13.

**12.10** <u>Counterparts.</u> This Operating Agreement may be executed in two or more parts, each of which shall be deemed an original but all of which together shall be one and the same instrument.

27

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 17 de 17
Case 3:25-cv-01323 Document 1-1 Filed 06/14/25 Page 42 of 45
**EXHIBIT A**

**12.11** <u>Facsimile Copy.</u>  A facsimile copy of this Operating Agreement and any signatures affixed hereto shall be considered for all purposes as originals.

**IN WITNESS WHEREOF**, the Members have signed this Agreement as of the Effective Date.

**MR. PRETZELS INTERNATIONAL**, **LLC**

**By: Bachir Mihoubi**
Title: Operating Manager

**By: LUIZ A. PENNA,** Member and
51% Equity Interest

**By: BACHIR MIHOUBI,** Member
49% Equity Interest

28

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 1 de 3
Case 3:25-cv-01323   Document 1-1   Filed 06/14/25   Page 43 of 45
EXHIBIT A

# WRITTEN CONSENT OF THE MEMBER HOLDING THE MAJORITY (51%) OF MR. PRETZELS INTERNATIONAL, LLC'S EQUITY INTEREST

## MAY 27, 2025

**THE UNDERSIGNED,** being the Member holding the Majority Interest of **MR. PRETZELS INTERNATIONAL, LLC,** a limited liability company organized under the laws of the State of Georgia ("MPI" or the "Company"), does hereby consent  to and adopts the following resolutions and actions as of the date of this written consent, all of which resolutions and actions shall be  as valid  and legal and of the same force and effect as though adopted at a meeting duly  and validly notified and held:

**WHEREAS**, the Company executed on August 21,2006 a Limited Liability Company Operating Agreement ("Operating Agreement");

**WHEREAS**, pursuant to Section 3.6 of the Operating Agreement, Bachir Mihoubi ("Mihoubi") and Luiz A. Penna ("Penna") are the Members of the Company ("Members").

**WHEREAS**, pursuant to Section 3.5 of the Operating Agreement, Mihoubi currently serves as Operating Manager of the Company;

**WHEREAS**, pursuant to Section 8.5 of the Operating Agreement "[a]ny action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is taken by written consent of Members holding the number of outstanding Percentage Equity Interests necessary for the action and entitled to vote thereon. Such action without meeting shall be evidenced by one (1) or more written consents to be filed with the Company's records;"

**WHEREAS**, Section 6.13 of the Operating Agreement (Involuntary Withdrawal) provides that "[a] Member may be removed at any time (1) with cause by a vote of a majority of all Members eligible to vote;"

**WHEREAS**, Section 6.13 of the Operating Agreement further provides that in the event of involuntary withdrawal of a Member, said Member's "Membership Interest shall be repurchased by the other members in a pro-rata basis" at "the Fair Value of all of its Membership Interest as defined in article 3.4" of the Operating Agreement and this payment "shall be the full and only consideration of the redemption of the removed Members' Membership Interest;"

**WHEREAS**, pursuant to Section 4.3 of the Operating Agreement, Penna owns Fifty One percent (51%) of the Company, thus holding the Majority Interest (defined in Section 3.15 of the Operating Agreement as "interest@ 50% + 1% of the Equity Interest of the Company") in the Company; and

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 2 de 3
Case 3:25-cv-01323    Document 1-1    Filed 06/14/25    Page 44 of 45
EXHIBIT A

**WHEREAS**, the Member holding the Majority Interest in the Company has determined there is cause for the removal of Mihoubi as a Member of the Company.

**WHEREAS,** the Member holding the Majority Interest in the Company has determined that it is in the best interest of the Company to remove Mihoubi as a Member of the Company by voting his Percentage Equity Interests (51%) in the Company pursuant to Section 6.13 of the Company's Operating Agreement;

**WHEREAS**, in light of Mihoubi's removal or involuntary withdrawal as a Member of the Company, Mihoubi is also immediately removed from all positions held by Mihoubi, namely, Operating Manager, Company Secretary and Company Treasurer, effective immediately.

**NOW, THEREFORE, BE IT RESOLVED**, that the Member holding the Majority Interest in the Company hereby exercises his votes (51%) and approves the removal of Mihoubi for cause as Member of the Company, and hereby revokes all prior powers, authorizations and directions delegated to Mihoubi, as Member and Operating Manager, Secretary and Treasurer, effective immediately;

**BE IT FURTHER RESOLVED**, that an orderly transfer of all hard copy and digital financial, operational, and administrative records under the control of Mihoubi or any affiliated party shall be completed within ten (10) calendar days of this Written Consent. All records shall be delivered to the Member holding the Majority Interest in the Company who is hereby authorized to take all necessary steps to implement this resolution, including written notice to all relevant parties, service providers, and financial institutions;

**BE IT FURTHER RESOLVED**, that the Member holding the Majority Interest in the Company authorizes any changes to the principal place of business of the Company and to its registered office and agent, as well as any other coporate change, as deemed necessary by the Member holding Majority Interest, in compliance with the corresponding laws;

**BE IT FURTHER RESOLVED**, that the Member holding the Majority Interest in the Company approves the payment of Fair Market Value of Mihoubi's Equity Interest in the Company per Section 3.4 of the Operating Agreement. However, to the extent Mihoubi and Penna currently cannot agree on how the "Fair Market Value of Equity Interest" should be calculated, the amount Penna has determined to constitute the Fair Market Value of Mihoubi's Equity Interest in the Company shall be held in escrow until all mediation and/or arbitration proceedings or corresponding judicial action has been finalized and a final resolution or judgment has been issued by a competent mediator, arbitrator or judge; and

**BE IT RESOLVED,** that this Written Consent shall be inserted in the Minute Book of the Company.

SJ2025CV05348 13/06/2025 02:57:51 pm Entrada Núm. 1 Página 3 de 3
Case 3:25-cv-01323    Document 1-1    Filed 06/14/25    Page 45 of 45
**EXHIBIT A**

**IN WITNESS THEREOF**, the Member holding the Majority Interest in the Company has executed this Written Consent on the first date stated above. Also on this date, after attempting to resolve ongoing disputes with Mihoubi using good faith, Penna presented Mihoubi with a Formal Demand for Mediation pursuant to Section 12.11.1 of the Company's Operating Agreement.


_____
Luiz A. Penna
Member holding the Majority (51%) of the Equity Interest